UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**CONNIE ANN ERNEWEIN,**

**Plaintiff,**

          v,

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:19-cv-01544-TPK

OPINION AND ORDER

## OPINION AND ORDER

      Plaintiff Connie Ann Ernewein filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security. That final decision, issued by the Appeals Council on September 16, 2019, denied Ms. Ernewein's applications for social security disability benefits and supplemental security income. Ms. Ernewein has now moved for judgment on the pleadings (Doc. 10), and the Commissioner has filed a similar motion in response (Doc. 14). For the following reasons, the Court will **GRANT** Plaintiff's motion, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

### I. BACKGROUND

      Plaintiff was 59 years old when she filed her applications for benefits on May 5, 2016. Plaintiff alleged that she had been disabled since March 1, 2013. After initial administrative denials of her claim, Plaintiff appeared at an administrative hearing held on November 5, 2018, at which she and Victor G. Alberigi, a vocational expert, both testified.

      The Administrative Law Judge issued an unfavorable decision on November 30, 2018. In that decision, she first concluded that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2014, and that she had not engaged in substantial gainful activity since her alleged onset date. Next, the ALJ determined that Plaintiff suffered from severe impairments including degenerative cervical spondylosis and facet arthropathy, cervicalgia, bilateral facet joint arthritis, bursitis of the right hip, mild bilateral hip osteoarthritis, lumbar spondylosis, rheumatism, fibrositis, myalgia, costochrondritis, cervical foraminal stenosis, status post traumatic pneumothorax and fractured ribs, and chronic pain syndrome secondary to a motor vehicle accident. The ALJ further found that Plaintiff had a number of non-severe impairments and that none of her impairments met the criteria for disability set out in the Listing of Impairments.

According to the ALJ, Plaintiff's impairments limited her to performing work at the light exertional level. Plaintiff's past relevant work included the job of general cashier, and the ALJ found that this job could be performed at the light exertional level. Because she was able to perform her past relevant work, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff, in her motion for judgment, asserts the following claims of error. She argues (1) that the ALJ erred in evaluating the opinion evidence from a physician's assistant who provided treatment to Plaintiff; (2) that the ALJ erred by finding that Plaintiff's fibromyalgia was not a medically determinable impairment; (3) that the ALJ impermissibly based the residual functional capacity finding on her own lay interpretation of the evidence as opposed to basing it on the medical opinions of record; (4) that the ALJ erred because she did not include any mental limitations in the residual functional capacity finding; (5) that the ALJ failed to set out a function-by-function analysis of Plaintiff's capabilities; and (6) that the ALJ should have found Plaintiff disabled under the Medical-Vocational Guidelines because it was error to have determined that she could do her past relevant work.

## II.  THE KEY EVIDENCE

The Court will begin its review of the record by summarizing Plaintiff's testimony at the administrative hearing. It will then recap the relevant information contained in the medical records.

Plaintiff first testified that she lived in an apartment with her adult son. She did not do laundry because she could not carry it up and down the steps, but she could wash dishes, do light grocery shopping, and do housework apart from running the vacuum. She drove several times per week, mostly to the grocery store. She was a high school graduate and had also taken some college courses.

Asked about her past work, Plaintiff said she had been a cashier at a Rite Aid store. That job involved unloading products from trucks, so she had to lift up to 20 pounds. She had also been a cashier at a Wal-Mart store, a job that was much less physical than the Rite Aid position. She stopped working due to pain which prevented her from doing the lifting and standing requirements of the job.

Plaintiff said that she could no longer work due to severe, stabbing pain beginning in her left ribcage and radiating into her neck and back. Her doctors had provided various explanations for the pain and also prescribed medications such as Prednisone, lidocaine, and Cymbalta. Although she said that the Cymbalta was to treat both pain and depression, Plaintiff was not receiving any mental health treatment and her counsel said that she was not pursuing a claim based on mental impairments.

On a typical day, Plaintiff did some housework, but she also slept during the day because she did not sleep well at night. She believed she could walk for 30 minutes and sit for about the same amount of time, but she could stand for only half that amount of time. She was able to use a computer and she watched television and read. She had been through physical therapy several times without any relief.

The vocational expert, Mr. Alberigi, classified Plaintiff's past work as general cashier, a light, unskilled job. He was asked if someone who could do a relatively full range of light work, reduced only by the inability to stand for more than four hours during a workday, and for only one hour at a time, and who could only occasionally stoop, kneel, crouch, crawl, push, pull, climb stairs and ramps (but never ladders or ropes) could do the general cashier job. He testified that such a person could not do so, although he or she could do some more specialized jobs like parking lot cashier. To do the general cashier job, a person would have to be able to stand continuously for at least six hours in a workday. Anyone off task for more than 7% or 8% of the workday could not keep that job, however.

Turning to the medical records, x-rays taken of Plaintiff's thoracic spine in 2012 were normal, and x-rays taken in 2012 and 2014 showed that Plaintiff had some mild degenerative changes of the facet joints in her lower back. She also reported, in 2014, a one-year history of retrosternal chest discomfort increasing with certain movements or deep breathing. The diagnosis at that time was chest pain of uncertain etiology. In early 2015, she described her symptoms as pain all over, worsening in the past year, not relieved by medication and causing extreme fatigue. A later examination revealed some tenderness in the hips and upper ribs near the sternum, and at least one doctor in 2015, and another in 2016, suggested her symptoms might be related to a 1976 car accident. There are multiple office notes from 2015 recording her complaints of chronic pain. X-rays from 2016 also showed mild bilateral hip osteoarthritis and mild degenerative changes throughout the thoracic spine. Most of her examinations during this time showed normal gait, muscle strength, and range of motion. However, when she was seen for physical therapy in July, 2016, she reported pain exacerbated by bending, lifting, reaching, stair climbing, standing, turning, twisting, and walking. At that time, she had reduced range of motion in her back and neck.

Plaintiff began reporting right hip pain in early 2017, stating that it had begun several months earlier. X-rays taken at that time were negative, however. Shortly thereafter, she complained of right hip tenderness and stiffness as well as fatigue, and she was diagnosed with tronchanteric bursitis of the right hip as well as age-related osteoporosis. Later in 2017, she was also diagnosed with an adjustment disorder with depressed mood. Another treatment note from that year indicated that she had a "hx of fibromyalgia" but her diagnosis remained chest pain, unspecified (Tr. 746). At times, she appeared anxious and in pain during examinations.

Physician's assistant Susan Patronix, who had been seeing Plaintiff regularly since 2015, completed a form on September 12, 2018, stating her opinion about Plaintiff's physical impairment. The most significant limitations she identified were sitting for only two hours at a

time (but up to six total hours in a workday), standing only one hour at a time (and only three hours in a workday), walking only an hour at a time (and only four hours in a workday), needing opportunities to rest during the day, lifting only ten pounds, and not being able to work on a regular and consistent basis. (Tr. 840-44). The only other medical opinion came from Dr. Brauer, a consultative examiner, who performed his evaluation on July 13, 2016. Plaintiff told him that she got pain sporadically and in a random pattern and that it could be excruciating at times. Her activities of daily living included cooking, cleaning, and doing laundry as well as reading and watching television. Her physical examination findings were entirely normal, and on that basis Dr. Brauer said that she had no limitations in her physical abilities. (Tr. 845-48).

### III. STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

### IV. DISCUSSION

#### A. The Opinion Evidence

Plaintiff's first claim of error is that the ALJ did not properly evaluate the opinion

expressed by Susan Patronix, a physician's assistant who provided treatment to Plaintiff. As noted above in the summary of the evidence, Ms. Patronix's opinion, if accepted, would have precluded the performance of any substantial gainful employment. According to Plaintiff, "[i]t was error for the ALJ to concluded that [this opinion] was consistent with record evidence but fail to adopt any portion of it in the RFC." Plaintiff's memorandum, Doc. 10, at 17. In response, the Commissioner argues that a physician's assistant is not an acceptable medical source and that the ALJ had a considerable amount of discretion in deciding how much weight to give to Ms. Patronix's opinion. Given that discretion, and the lack of support for the opinion within the treatment notes from Ms. Patronix's office, the Commissioner contends that the ALJ dealt adequately with the opinion, giving it some weight and using as the basis for limiting Plaintiff to the performance of light work.

The ALJ, after giving little weight to the opinion of Dr. Brauer because it conflicted with the results of multiple examinations showing that Plaintiff had decreased range of motion and tenderness in her low back, assigned some weight to Ms. Patronix's opinion. She noted that the opinion did contain various limitations on sitting continuously, lifting, and working more than four hours per day, but considered these limitations to have been based on Plaintiff's reports of pain and not on objective findings. She then recited various objective findings in the record supporting some limitations, including Plaintiff's history of back pain and its progression since the 1976 accident, but also observed that Plaintiff had worked for many years after the accident, had normal strength and gait, that nerve conduction studies were normal, and that testing showed only mild degenerative changes in her back. Based on all of these factors, the ALJ concluded that Plaintiff was able to function at a higher level than indicated by Ms. Patronix (Tr. 21).

The Commissioner is correct that Ms. Patronix, as a physician's assistant, is not considered to be an acceptable medical source. As this Court recognized in *Kirchoff v. Colvin*, 2016 WL 6090583, at *2 (W.D.N.Y. Oct. 19, 2016), "a physician's assistant is not an 'acceptable medical source' but rather is considered an 'other source' under the Regulations. See 20 C.F.R. §§ 404.1513(a)...." There was therefore no requirement that the ALJ articulate her rejection of that opinion in any particular manner other than to provide the Court with a basis for reviewing it. Although Plaintiff argues that the ALJ's decision was inherently contradictory, stating both that the opinion was given some weight because it was consistent with the record, while at the same time failing to incorporate any of its limitations into the residual functional capacity finding, that is not how the Court understands the ALJ's reasoning. The ALJ clearly used this opinion as a basis for discounting the views of the consultative examiner. She explained, however, that she did not find any objective support in the record for the proposition that Plaintiff could work only four hours per day or that she needed to change positions in the way that Ms. Patronix said she would. That is a permissible interpretation of this record. Under these circumstances, the ALJ did not err by not giving more weight to Ms. Patronix's opinion. That conclusion does not answer the question of whether the ALJ's residual functional capacity finding was adequately supported, however, and that issue is addressed in subsection (C) below.

### B. Fibromyalgia as a Medically Determinable Impairment

As her second claim of error, Plaintiff takes issue with the ALJ's determination that fibromyalgia was not, on this record, a medically determinable impairment. She argues that she met the criteria for diagnosing this impairment set out in Social Security Ruling 12-2p. Had this impairment been recognized, she asserts, the ALJ may have imposed additional functional limitations and may have changed the ALJ's reading of Ms. Patronix's opinion. According to the Commissioner, however, because no physician actually diagnosed Plaintiff with fibromyalgia but only reported it as part of her medical history, it was entirely proper for the ALJ to conclude that it was not a medically determinable impairment.

Contrary to the Commissioner's argument, the ALJ concluded that the record contained a diagnosis of fibromyalgia. As support for this statement, she cited to Exhibits 30F and 28F, which are, respectively, records from Orchard Family Practice and from Dr. Buscaglia, a specialist in pulmonary, critical care, and sleep medicine who saw Plaintiff on May 8, 2017, for evaluation of chest pain. The former set of records do state in one place, as the Commissioner contends, that Plaintiff had a "history" of fibromyalgia (Tr. 746) but in a note dated August 26, 2016, fibromyalgia is listed as an "assessment" and a care plan was developed. (Tr. 758). Earlier notes show that she was seen for follow-up of fibromyalgia and had been receiving treatment for it (Tr. 785) and that her diagnosis of myalgia was followed by the comment "probable myalgia." (Tr. 796). Although Dr. Buscaglia's note shows fibromyalgia as part of Plaintiff's "Problem list" (Tr. 716), it is difficult to characterize the Orchard Park records as not containing a diagnosis of fibromyalgia. The Commissioner contends that the only document with a firm diagnosis was prepared by a nurse practitioner, but that is not the only possible reading of the record. The ALJ did not interpret it that way, and the Court therefore does not accept the Commissioner's argument that the absence of a diagnosis justified the ALJ's determination that fibromyalgia was not a medically determinable impairment.

In reaching her ultimate conclusion on this issue, the ALJ determined that the diagnosis of fibromyalgia did not meet the standards for such a diagnosis as established by the Social Security Administration. She pointed out that "the record does not confirm that the claimant has the required number of tender point findings and there is no evidence that medical doctors have excluded other impairments as required in SSR 12-2p." Thus, she concluded that "this impairment does not meet the requirements set forth by the Social Security Administration for the determination that fibromyalgia is a medically determinable impairment." (Tr. 19). Nevertheless, the ALJ said that she considered this impairment when she limited Plaintiff to the performance of light work. *Id*.

SSR12-2p states, in part, that the Social Security Administration "will find that a person has [a medically determinable impairment of fibromyalgia] if the physician diagnosed FM and provides the evidence we describe in section II.A. or section II.B., and the physician's diagnosis is not inconsistent with the other evidence in the person's case record." That evidence includes a history of widespread pain and the fact that other disease processes which could cause such

symptoms have been ruled out. Additional requirements are, for section II.A, that an examination reveal at least eleven tender points, or, for section II.B, that the claimant experience repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, including (but not limited to) manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome.  It is this latter requirement that Plaintiff argues she has satisfied, pointing to record evidence that she suffered from fatigue, insomnia, chest pain, muscle pain, upper abdominal pain, nervousness, depression, numbness or tingling, and heartburn.  As Plaintiff notes in her reply, symptoms like these are listed in a footnote to SSR 12-2p as signs or symptoms of fibromyalgia.

      The Court finds the ALJ's analysis of this issue to be erroneous.  As noted, the ALJ did not discuss whether Plaintiff's various symptoms met the requirements of section II.B.  Rather, she appears to have decided that Plaintiff did not satisfy that section's requirements "because there is no evidence that medical doctors have excluded other impairments...." (Tr. 19). The Commissioner's argument that the record does not contain sufficient evidence of the symptoms listed in section II.B is an impermissible effort to bolster a decision not actually made by the ALJ.  Further, the Commissioner's memorandum does not address or attempt to support the ALJ's conclusion that the record did not show that other diagnoses had been excluded.  The ALJ herself did not explain this conclusory statement or cite to any of the record evidence to support it.  Consequently, the Court is in no position to review the reasonableness of the ALJ's conclusion on this issue.

      The question remains whether this is a reversible error.  Many courts, including judges from this Court, have held that an error made with respect to whether an impairment is medically determinable is typically not considered to be harmless error and usually results in remand.  *See, e.g., Keller v. Colvin*, 2017 WL 4112024, *14 (W.D.N.Y. Sept. 18, 2017) (*"the step two harmless error doctrine is inapplicable to a determination that an impairment is not medically determinable"*).  The rationale behind these decisions is that if the ALJ does not find a particular impairment to be medically determinable, the ALJ may not take into account, in determining the combined effect of the claimant's impairments, any limitations arising from that condition, and may not even consider the claimant's testimony about such limitations.  *See, e.g., Carpenter v. Astrue*, 2011 WL 3951623 (D. Vt. Sept. 7, 2011).  But that is not universally the case.  As understood in the context of social security cases, an error is harmless if there is "no reasonable likelihood that [correction of the error] would have changed the ALJ's determination...." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010), or, stated differently, that it "would not have affected the outcome." *Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009).

      Although the ALJ's statement that she took limitations due to fibromyalgia into account in her residual functional capacity analysis might suggest that the error was harmless, the Commissioner has not made that argument.  Further, it is not clear exactly how the ALJ factored this impairment into the residual functional capacity analysis, because other that asserting that she did so, there is nothing in her step four analysis which discusses fibromyalgia or its typical symptoms, including muscle pain, weakness, and fatigue.  Therefore, a remand is indicated based

on this error alone. The Court will, however, briefly discuss the other issues raised by Plaintiff because some of them should also be addressed during the course of remand proceedings.

### C. Support for the ALJ's Residual Functional Capacity Determination

Plaintiff's next contention is that the ALJ's residual functional capacity determination is not properly supported. As a review of the evidence reveals, the ALJ did not specifically adopt either the opinion of Dr. Brauer or Ms. Patronix. Plaintiff argues that because there was no medical opinion supporting the ALJ's residual functional capacity determination, it must have been based on the ALJ's own lay opinion. The Commissioner counters that an ALJ need not adopt any particular expert opinion on this issue, but may make a determination from the record as a whole, and that determination must be affirmed if supported by substantial evidence.

This Court has spoken in the past to the question of when an ALJ may make a residual functional capacity determination which does not match any of the opinion evidence. It said this about the Court of Appeals' oft-cited decision in *Matta v. Astrue,* 508 Fed.Appx. 53 (2d Cir. Jan 25, 2013):

> *Matta*, like the present case, involved an RFC which took into account, but did not mirror, the opinions of a number of different sources. The Court rejected the identical argument made by Plaintiff here - that the ALJ must necessarily have used his own lay opinion to craft the RFC because it did not match any one source's opinion - holding that "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). This Court has routinely applied that holding in similar situations. *See, e.g., Allen v. Comm'r of Social Security*, 351 F.Supp.3d 327 (W.D.N.Y. 2018).

*Riley v. Comm'r of Soc. Sec.*, 2019 WL 5287957, at *4 (W.D.N.Y. Oct. 17, 2019). As the Court said, the applicable rule is that "in a case such as this, the ALJ, while entitled to disagree with the medical opinions, can do so only for reasons which have a sound basis in the record itself." *Id*.

Here, the ALJ gave reasons for giving less than controlling weight to Ms. Patronix's opinion, a decision which the Court has found to be within the range of her discretion. She also had good reasons for not adopting the conclusions reached by Dr. Brauer. But doing so created a significant gap in the record, because the former opinion was work-preclusive and the latter imposed no limitations at all. The medical evidence in this case does not definitively point to a specific functional capacity. Although there were many normal objective findings, there is also, as discussed above, a diagnosis of fibromyalgia (as well as diagnoses of myalgia and fibrositis), all of which limit a claimant's activities but do not necessarily produce findings through x-rays or other testing procedures. There is no question that Plaintiff reported, and was treated for,

significant pain, and no physician suggested that it was not present; rather, the issue seemed to be its etiology as well as finding effective modes of treatment. The record further shows that many types of treatment, including medication and physical therapy, were largely ineffective. The ALJ also found that Plaintiff suffered from other severe impairments which, by their nature, affect a person's ability to stand and walk as required for light work, such as bursitis of the hip and osteoarthritis. Plaintiff's testimony and her description of her daily activities do not support the conclusion that she could perform the standing and walking requirements of a full range of light work. The conclusion that she could do so is, on this record, more a product of guesswork than of reasonable inferences drawn from the medical records, which clearly require interpretation by a medical expert. Consequently, this issue also must be addressed in the context of remand procedures.

### D. Mental Limitations

The ALJ's residual functional capacity finding did not include any mental limitations. However, the ALJ did analyze Plaintiff's mental impairments in that portion of the decision devoted to determining the severe impairments from which Plaintiff suffered from, and in doing so characterized the degree of Plaintiff's mental impairment as "mild" in several areas of functioning. Plaintiff argues that some level of mental functional impairment should have been incorporated into the residual functional capacity finding. To the contrary, the Commissioner argues that in the absence of any disagreement that Plaintiff had no severe mental impairment, and without any medical source identifying functional limitations arising from her non-severe mental impairments, the ALJ's decision not to include mental limitation in the residual functional capacity finding was supported by the record.

Plaintiff appears to be arguing that when the step two determination that a mental impairment is not severe includes findings that a claimant has mild (as opposed to no) limitations in certain functional areas - which is what occurred here - an ALJ automatically errs by not including some mental limitations in the step four residual functional capacity finding. That is argument goes too far, however. This Court has often upheld such determinations. *See, e.g., Goettel v. Comm'r of Soc. Sec.*, 2019 WL 6037169, at *6 (W.D.N.Y. Nov. 14, 2019). True, it is error if an ALJ fails to recognize that even non-severe mental impairments must be considered in connection with the step four analysis, but that does not appear to be the case here. The ALJ specifically found that there were no mental limitations which affected Plaintiff's ability to perform light work. *See* Tr. 19 ("the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis"). Nevertheless, on remand, the ALJ should consider whether there is any credible evidence that even Plaintiff's mild mental limitations affected her ability to perform work-related activities.

### E. Remaining Issues

In her fifth claim of error, Plaintiff faults the ALJ for failing to provide a function-by-

function analysis of Plaintiff's work capabilities.  In her sixth claim, she argues that she should not have been determined to be able to perform the standing requirements of the cashier's job and that the applicable sections of the Medical-Vocational Guidelines (Rules 201.04 and 202.04) therefore direct a finding of "disabled" for someone with her vocational characteristics.  Since the case is being remanded for further proceedings on the issue of Plaintiff's residual functional capacity, both of these issues are presently moot and will presumably be addressed once a new finding is made.

## V.  CONCLUSION AND ORDER

For the reasons set forth in this Opinion and Order, the Court **GRANTS** Plaintiff's motion for judgment on the pleadings (Doc. 10), **DENIES** the Commissioner's motion (Doc. 14), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

/s/ Terence P. Kemp
**United States Magistrate Judge**